REXACH CONCRETE CORP., demandante y recurrida, *v.* JARDINES DE MONTE OLIVO DEVELOPMENT CORP., CENTRO DE PUERTO RICO DEVELOPMENT CORP., demandados; BANCO CENTRAL Y ECONOMÍAS, interventor y recurrente; LAUSELL ALUMINUM JALOUSIES, INC., demandante y recurrida, *v.* JARDINES DE MONTE OLIVO DEVELOPMENT CORP., CENTRO DE PUERTO RICO DEVELOPMENT CORP., demandados; BANCO CENTRAL Y ECONOMÍAS, interventor y recurrente; LAUSELL COMMERCIAL, INC., demandante y recurrida, *v.* JARDINES DE MONTE OLIVO DEVELOPMENT CORP., CENTRO DE PUERTO RICO DEVELOPMENT CORP., demandados; BANCO CENTRAL Y ECONOMÍAS, interventor y recurrente.

*Números:* R-78-312, *Resueltos:* 20 de marzo de 1979
R-78-313,
R-78-314

552

*Sweeting, Pons, González & Rodríguez* y *Noel González Miranda,* abogados del Banco Central y Economías; *Maximiliano Trujillo González,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Este recurso trata sobre la anotación de un crédito refaccionario bajo nuestro Código Hipotecario, mecanismo considerado hace más de cuatro décadas ". . . extinto, podríamos decir, en la biología jurídica de nuestro país." VII Rev. Jur. U.P.R., Núm. 2, 149 (1937). Expongamos los hechos.

Jardines de Monte Olivo Development Corp., como dueña de una finca situada en Guayama, Puerto Rico, a través del contratista general Centro de Puerto Rico Development Corp., desarrolló un proyecto de urbanización denominado "Residen-

cial La Hacienda". Las obras de construcción realizadas[1] fueron objeto de financiamiento interino por el recurrente Banco Economías—ahora Banco Central y Economías—garantizado con una primera hipoteca inscrita por $6,000,-000.00.

Rexach Concrete Corp., Lausell Aluminum Jalousies, Inc. y Lausell Commercial, Inc., demandaron separadamente a Jardines de Monte Olivo Development Corporation y a Centro de Puerto Rico Development Corp., reclamándoles el pago de los materiales suplidos a estas últimas dos corporaciones y solicitando además, un dictamen judicial decretando que ellos son titulares de un crédito refaccionario por el importe del precio de tales materiales y una orden al Registrador de la Propiedad de Guayama para que tome anotación preventiva de dichos créditos refaccionarios sobre el inmueble objeto de la construcción del proyecto. Banco Central y Economías, si bien no fue incluido expresamente en los pleitos, fue notificado con copias de las respectivas demandas mediante citaciones al efecto de conformidad al trámite establecido en el Art. 106 de la Ley Hipotecaria de Puerto Rico (30 L.P.R.A. sec. 987).[2] Ninguno de los demandados, como tampoco el

---

[1] Sobre el particular la ilustrada sala de instancia estimó probado:

"Dicho proyecto consta de varias partes y etapas, y que tiene proyectadas 1,997 unidades en total, de las cuales hay entregadas y segregadas 359 unidades, están en diverso estado de edificación (pero sin entregar ni segregar) 76 unidades, el resto no están edificadas. Asimismo se han realizado obras de alcantarillado y acueductos, de líneas eléctricas y de desague pluvial para beneficio de toda la finca. Por lo que, visto el ámbito del proyecto, las obras realizadas y las que faltan por realizar, se concluye que las obras objeto de la refacción en este proyecto y finca no están terminadas."

[2] El señalamiento del Banco recurrente respecto a falta de jurisdicción no tiene mérito ya que fue debidamente emplazado entregándosele copia de las demandas. Tales documentos cumplen sustancialmente con los requisitos procesales vigentes. Véanse: Regla 4 de Procedimiento Civil; *Banco de P.R., Liquidador, etc.* v. *Portela*, 46 D.P.R. 108–110 (1934); *Lawton* v. *Porto Rico Fruit Exchange*, 42 D.P.R. 291, 293 (1931); *Benero* v. *Alvarado, et al.*, 39 D.P.R. 778, 781–783 (1929); *López* v. *Mélendez*, 22 D.P.R. 156, 162, 165 (1915).

Banco, comparecieron al tribunal. En su oportunidad se anotó y dictó sentencia en rebeldía en cada uno de los pleitos mencionados reconociéndose a los demandantes la legitimidad de las deudas, y respecto a cada crédito refaccionario se hizo "constar que es de carácter hipotecario y que goza de preferencia sobre los créditos hipotecarios inscritos anteriormente en lo que exceda el precio que alcance la finca en su enajenación judicial a la cantidad de $1,886,636.25 que constituye el último precio dado a la finca antes de las obras." A solicitud del Banco, acordamos revisar.

## I

■ Etimológicamente, el término refacción tiene su raíz latina en el verbo *reficere*, que significa rehacer, hacer de nuevo, subsanar, reedificar, esto es, "dar existencia a lo que sin el auxilio de nuevas obras va a perecer": Galindo y Escosura, *Comentarios a la Legislación Hipotecaria*, Tomo II, 521 (4ta. ed.); Casso y Romero, *Diccionario de Derecho Privado*, Tomo I, 362 (1954). Su génesis se remonta al derecho romano que reconoció ". . . el crédito o la garantía refaccionaria, aplicado a la reconstrucción y reparación de edificios (*pignus insulae*) y a armar las naves." Roca Sastre, *Derecho Hipotecario*, Tomo III, 67 (1968). En su desarrollo histórico Marco Aurelio, en su capacidad de Senado-consulto, la estimó como una hipoteca legal tácita, de carácter preferente *erga omnes*, concepto que en su peregrinaje hacia España recogieron Las Partidas, [3] conservaron las Leyes del Toro, pero la Primera Ley Hipotecaria descartó. Hoy en día, tanto allá como en Puerto Rico, el crédito refaccionario puede asegu-

---

[3] "Como aquel que presta sus dineros, para adobar, o para fazer naue, o otro edificio, la mayor derecho en ello para ser pagado, que otro ninguno. Naue, o cosa, o otro edificio aviendo empeñado vn ome a otro, si después desso rescibiesse de otro dineros prestados, para refazer, e guardar aquella cosa, que se non destruyesse, o non se empeorasse, e los dependiesse en pro della, entonces mayor derecho ha en ella el segundo. . . ." Partida V, Título 13, Ley 28. (Bastardillas nuestras.)

rarse en virtud de una *anotación preventiva*(⁴) que puede convertirse en una verdadera hipoteca legal.

■ Nuestro Código Civil no contiene definición alguna sobre lo que constituye un "crédito refaccionario", limitándose a mencionarlo en los Arts. 1823 y 1827 que tratan respectivamente sobre la preferencia de que goza dicho crédito con relación a determinados bienes inmuebles, y su prelación al concurrir con otros créditos preferidos. (31 L.P.R.A. secs. 5193 a 5212.) Tampoco la Ley Hipotecaria nos brinda una definición aun cuando al regular la garantía refaccionaria que se logra mediante la anotación preventiva de dicho derecho—susceptible de convertirse en inscripción ordinaria de hipoteca—deja entrever ciertas características de la institución. A tal efecto, el Art. 59 consigna que "el acreedor refaccionario podrá exigir anotación sobre la finca refaccionada por las *cantidades* que de una vez o sucesivamente anticipare . . . ." (30 L.P.R.A. sec. 108), dando la impresión de que éste surge por motivo de las cantidades prestadas para la construcción de una cosa. Contrario a este parecer, el Art. 60 nos habla de "la cantidad de dinero o *efectos* en que consistan los mismos créditos . . . ." (30 L.P.R.A. sec. 109), lo que nos mueve a pensar seriamente si el crédito refaccionario está limitado exclusivamente a dinero.

Los autores están divididos. Si bien Roca Sastre expresa que "[c]rédito refaccionario es aquél que se *contrae y emplea* en la construcción, conservación o reparación de una cosa (sentencia de 13 de abril de 1882) [que e]xiste . . . cuando una persona ha invertido en obras de construcción, conservación o reparación de una cosa, *una cantidad* que le ha sido prestada en una o varias veces *para tal fin*", reconoce que

---

(⁴) 30 L.P.R.A. sec. 108. Véanse: Ramón de la Rica, *La Anotación Preventiva en General*, Rev. Crítica de Derecho Inmobiliario, Núm. 519, 389–411 (1977); Luis Diez Picazo, *Las Anotaciones Preventivas*, Revista de Derecho Notarial, Núm. 44, 7–28 (1964); Eduardo Capó Bonafous, *Apuntes sobre la Anotación Preventiva en el Derecho Hipotecario Español*, Rev. Crítica de Derecho Inmobiliario, Núm. 9, 196–200 y 282–296 (1933).

"para que un crédito tenga la condición de refaccionario se requiere que el préstamo [o *suministro de materiales*], reúna las características de finalidad, objeto o destinación para las obras de refacción . . . ." *Op. cit.*, 65, 69. Puig Brutau, citando con aprobación a Diez-Picazo consigna que es "un acreedor cuyo derecho deriva de un *contrato de préstamo*, en el cual el destino de la cantidad prestada se ha fijado en obras de construcción o de reparación de un bien y la inversión efectiva de la misma se ha realizado en tales obras." *Fundamentos de Derecho Civil*, Tomo I, 568 (1976). Morell nos dice: "Suele aplicarse estas palabras a los edificios. El propietario recibe *dinero* para reconstruir o para hacer reparaciones indispensables. Del mismo modo puede considerarse como refaccionario el crédito cuando la *cantidad* fue facilitada para una nueva construcción casa, vía férrea, canal, etc." No obstante, posteriormente cita con aprobación a Barrachina en un texto del cual se deduce que el crédito puede dimanar de los materiales que se hubiesen servido. *Comentarios a la Legislación Hipotecaria*, Tomo 3, 159–160 (1917).

En España, aun cuando la jurisprudencia es escasa, el Tribunal Supremo, mediante sentencia de 11 de octubre de 1894, reconoció el carácter de acreedor refaccionario al vendedor de una tubería utilizada por el comprador en su finca y reiteró su dictamen previo el 30 de diciembre de 1896, por sentencia que adjudicó igual cualidad a los anticipos en metálico y materiales hechos por el empresario de una obra. Más recientemente juristas de la talla de Diez-Picazo y Gullón, sostienen el siguiente enfoque:

"Una concepción estrecha del crédito refaccionario, como es la que parece desprenderse de la legislación hipotecaria, identifica al mismo con el préstamo de dinero que se destina a la construcción, conservación o reparación de un inmueble. *Sin embargo, no parece haber inconveniente en estimar como crédito refaccionario al que tiene una persona como consecuencia de la puesta de trabajo o suministro de materiales para alguno de aquellos fines.*" *Sistema de Derecho Civil*, Vol. III, 336 (1977). (Bastardillas nuestras.)

■ En resumen, un número sustancial de reputados tratadistas([5]) vinculan la definición de crédito refaccionario con un préstamo o entrega de dinero, guardando silencio sobre si el concepto cabe en orden a un suministro de materiales. Al evaluar las razones de justicia que inspiran la existencia del crédito refaccionario, resolvemos que el concepto permite que los suplidores de un contratista, para garantizar el pago de sus materiales, pueden anotar, con sujeción a lo dispuesto en la Ley y Reglamento Hipotecario, dicho crédito.

## II

¿Eran los demandantes recurridos titulares de unos créditos refaccionarios? ¿Fue correcta la orden judicial decretando que [ellos] gozaban ". . . de preferencia sobre los créditos hipotecarios inscritos anteriormente en lo que exceda el precio que alcance la finca en su enajenación judicial, a la cantidad de $1,886,636.25, que constituye el último precio dado a la finca antes de las obras"? Estas interrogantes exigen cierta elaboración.

■ El examen de los artículos pertinentes de la Ley y Reglamento Hipotecario, refleja que el trámite para solicitar la anotación del crédito refaccionario recae sobre el *deudor*. No existe disposición de ley alguna o comentarista que sugiera que un acreedor que ha suplido materiales, puede válidamente convertir su crédito en uno de naturaleza refaccionaria iniciando *motu proprio* trámite al efecto. El derecho vi-

---

([5]) Véanse, además: La Cruz Berdejo, *Lecciones de Derecho Inmobiliario Registral*, 317 (1957); Cossio y Corral, *Instituciones de Derecho Hipotecario*, 269–274 (1956); M. González, *Los Procedimientos Judiciales de la Ley Hipotecaria*, 67–68 (1955); Dorta Duque, *Curso de Legislación Hipotecaria*, 393–395 (1953); Casso, *Derecho Hipotecario o del Registro de la Propiedad*, 540–544 (1951); Tellez, *Legislación Hipotecaria*, 160–161 (1949); Beraud y Lezón Fernández, *Tratado de Derecho Inmobiliario*, Vol. II, 3–13 (1927); Campuzano, *Principios Generales de Derecho Inmobiliario y Legislación Hipotecaria*, Tomo II, 58–63 (1941); Campuzano, *Legislación Hipotecaria*, Tomo 2, 23–31 (1942).

gente autoriza su anotación distinguiendo dos hipótesis diferentes, a saber, que la finca esté o no libre de cargas inscritas. Anotamos no obstante, que la iniciativa recae en el deudor o propietario.

Bajo el primer supuesto, si la finca no se halla gravada por derechos reales inscritos a favor de otras personas, es suficiente presentar una solicitud con el documento—que puede ser privado—acreditativo del contrato suscrito por el propietario de la finca y el acreedor, para lo cual deben todos los interesados acudir al Registro personalmente o por apoderado especialmente autorizado. Se trata de una situación donde hay completa armonía entre el deudor y el acreedor, ambos deseosos de que se complete rápida y eficientemente la operación registral con miras cada uno de lograr su propósito: el deudor obtener el dinero y el acreedor garantizar su devolución.

En el segundo supuesto—que la finca está gravada por derechos reales inscritos a favor de terceras personas—sólo se puede hacer la anotación en virtud de los siguientes trámites: (a) convenio *unánime por escritura pública entre el propietario* y las personas a cuyo favor estuvieren constituidos aquellos derechos, sobre el objeto de la refacción misma y el valor de la finca antes de empezar las obras; (b) mediante providencia judicial dictada en expediente instruido para hacer constar dicho valor y con citación de todas las personas indicadas, con carga o derecho real a su favor. Arts. 59 a 64 de la Ley Hipotecaria (30 L.P.R.A. secs. 108–113).

El Reglamento Hipotecario establece los pasos a seguirse en el procedimiento judicial para obtener la anotación, Arts. 104 al 109 (30 L.P.R.A. secs. 984–989). El procedimiento se insta ante el Tribunal de Primera Instancia, expresando las obras que necesita la finca, su costo aproximado y el valor que la misma finca tenga en dicho momento. Se citarán a todas las personas interesadas según el Registro, acompañándose una certificación con el aprecio pericial. Puede mediar opo-

sición contra la necesidad de las obras o el aprecio de la finca. El tribunal, previa la correspondiente prueba pericial, dictará resolución autorizando o prohibiendo la anotación preventiva del crédito refaccionario.

 Bajo cualquiera alternativa—ordenada por el tribunal o consentida por las partes—se extenderá por el Registrador asiento correspondiente, no siendo necesario que los títulos en cuya virtud se solicite tal anotación determinen fijamente la cantidad de dinero o efectos en que consistan los mismos créditos. Basta que contengan los datos suficientes para liquidarlos al terminar las obras contratadas. Aclaramos, sin embargo, que es absolutamente necesario que se consigne "el valor que en cualquier forma se diere a la finca que ha de ser refaccionada, antes de empezar las obras." (30 L.P.R.A. sec. 112.) Esta constancia es de suma importancia pues la regla general es que los acreedores hipotecarios anteriores a la anotación del crédito gozan y conservan su derecho preferente hasta el valor fijado a la finca antes de la refacción; de dicho límite en adelante, el valor adicional ganado por la finca estará al servicio preferente de los acreedores refaccionarios. Roca Sastre explica los efectos del siguiente modo:

"La ley, queriendo armonizar los intereses de los acreedores hipotecarios anteriores y del acreedor refaccionario que anota, divide en dos porciones el futuro valor en cambio de la finca, una vez esté refaccionada. Aplicando aquí la expresión usada por Oberneck en materia de la hipoteca de propietario, se puede hablar de dos parcelas de valor: *una consistente en la valoración dada a la finca, objeto de la anotación, antes de practicarse ésta,* y otra representada por el mayor valor que en su enajenación se obtenga. Aquel valor, que será el que tenía la finca antes de la refacción, está al servicio preferente de los acreedores hipotecarios anteriores; el segundo valor, que será el que con las obras refaccionarias se haya incrementado la finca, sirve preferentemente de garantía al crédito refaccionario. Este reparto de valores tendrá lugar, naturalmente, cuando la finca sea objeto de enajenación, la cual el art. 64 presupone que será judicial.

Por tanto, a base de esta delimitación o localización de valores, existen dos hipotecas paralelas, independientes la una de la otra, si bien afectantes a una misma finca.

Los dos créditos (el hipotecario anterior y el refaccionario), tienen el rango de primeras hipotecas en cuanto a su respectiva parcela de valor; pero actúan como segundas hipotecas en cuanto a la parcelación adscrita al otro crédito.

El derecho de los acreedores hipotecarios anteriores actuará, por ende, como primera hipoteca respecto del valor fijado a la finca antes de la anotación, y como segunda hipoteca en cuanto a la parte sobrante que quede del plusvalor asignado para el crédito refaccionario, después de satisfecho éste.

Esta actuación como segunda hipoteca tendrá lugar, principalmente, cuando el valor fijado a la finca antes de la refacción sea inferior al importe de los créditos hipotecarios anteriores." *Op. cit.,* 79. (Bastardillas nuestras.)

### III

A la luz de lo expuesto, es ineludible concluir que el tribunal sentenciador erró al reconocerle a los recurridos la anotación del crédito refaccionario por los siguientes fundamentos.

Primeramente, el procedimiento judicial, conforme el trámite consagrado en el Código y Reglamento Hipotecarios, corresponde al propietario o deudor de la finca. Un acreedor materialista no está autorizado a iniciar trámite por sí solo para anotar su crédito refaccionario. En segundo lugar, la cantidad de $1,886,636.25 consignada por el tribunal a quo para valorar la finca es errónea—supuestamente representa la suma de los precios de compraventa de las tres fincas agrupadas—por ser la cifra total exacta $1,939,386.25, y resultar improcedente que se tomara como valor cualesquiera de esas cuantías sin considerar el incremento natural de la finca y aquel resultante de las mejoras introducídales como consecuencia de las obras de urbanización realizadas antes de que se incorporaran a la misma los materiales suplidos por los demandantes recurridos. Y en tercer término, la primera

hipoteca del Banco recurrente se constituyó para garantizar un préstamo brindado con el propósito esencial de *financiar las obras de construcción sobre dichas fincas,* esto es, estamos ante una hipoteca voluntaria que asegura $6,000,000.00 prestados para la *refacción* del inmueble. Sin ella nunca cobraría existencia la obra, destinado su importe a sufragar, entre otros gastos esenciales, los propios materiales suplidos. Dicho de otro modo, la hipoteca del Banco recurrente que se pretendía limitar goza de la misma naturaleza—refaccionaria —que el crédito refaccionario de los recurridos. (⁶) En estas circunstancias, la plusvalía que se origina de un crédito de $6,000,000.00 debe beneficiar, en justicia, inicialmente al Banco tanto como primer acreedor hipotecario y de crédito refaccionario, por ser de estricta aplicación lo dispuesto en el Art. 1827 del Código Civil que consigna que la prelación de créditos idénticos se determinará "por el orden de antiguedad de las respectivas inscripciones o anotaciones en el registro de la propiedad." (31 L.P.R.A. sec. 5212.) Aplica pues, la regla común de *prior tempore potiur jure,* teniendo preferencia aquel crédito que primero se hizo constar en el Registro. Manresa, *Comentarios al Código Civil Español,* Tomo 12, 1005–1006 (1973).

*La sentencia del Tribunal Superior, Sala de Guayama, será revocada.*

El Juez Asociado Señor Martín concurre en el resultado con opinión y el Juez Asociado Señor Díaz Cruz emitió Voto Concurrente en el resultado.

—O—

Opinión concurrente del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 20 de marzo de 1979

Concurro con el resultado por la única razón de que acree-

---

(⁶) Este Tribunal, en *Gómez* v. *Am. Col. Bank,* 34 D.P.R. 148, 152–153 (1925), resolvió que un acreedor refaccionario no tiene que probar "que el *dinero* entregado ha sido invertido en mejorar la finca."

dores refaccionarios, como los de autos, no tienen derecho a solicitar judicialmente la anotación preventiva de su crédito en el Registro de la Propiedad, sobre una finca que estuviere afecta a obligaciones reales inscritas, por ser el deudor el único que puede instar la acción judicial correspondiente contra las personas a cuyo favor estuvieren constituidas dichas obligaciones conforme lo dispone específicamente el Art. 61 de la Ley Hipotecaria—30 L.P.R.A. sec. 110—y el 106 del Reglamento Hipotecario—30 L.P.R.A. sec. 986.

—O—

Voto concurrente en el resultado del Juez Asociado Señor Díaz Cruz

San Juan, Puerto Rico, a 20 de marzo de 1979

Ordena el Art. 59 de la Ley Hipotecaria (30 L.P.R.A. sec. 108):

Art. 59—*Anotación preventiva de crédito refaccionario— Anotación; surtirá efectos de hipoteca.*

"El acreedor refaccionario podrá exigir anotación sobre la finca refaccionada por las cantidades que de una vez o sucesivamente anticipare, *presentando el contrato por escrito que en cualquier forma legal haya celebrado con el deudor.*

Esta anotación surtirá, respecto al crédito refaccionario, todos los efectos de la hipoteca." (30 L.P.R.A. sec. 108.) (Énfasis suplido.)

Difiero del criterio expresado en la opinión al efecto de que la Ley Hipotecaria y su Reglamento asignan al deudor la iniciativa "para solicitar la anotación del crédito refaccionario." El crédito refaccionario se formaliza mediante *contrato* entre deudor y acreedor, como cualquier otro contrato de garantía. Lo que indica la Ley es que la concertación y formalización del contrato bilateral de refacción ha de preceder a la solicitud de anotación del crédito. Un suplidor de mate-

riales que no exigió tal contrato de refacción como *garantía previa* de los que hubiese convenido servir al dueño de la obra, no puede *sua sponte*, en forma unilateral, crearse esa garantía, ya entregados los materiales. Tampoco podría acudir al tribunal en solicitud de providencia declarativa de que el importe de los materiales suplidos está garantido por algo similar a la hipoteca.

Es al tiempo de iniciarse la relación contractual que el acreedor impone los términos y tipo de garantía, bajo los cuales suplirá dinero u otros bienes a su deudor. Para cambiar esos términos y garantía es indispensable la concurrencia del deudor, y también la de aquellos otros acreedores que pudieren ser afectados en el orden de prioridad de sus acreencias. (Art. 61 Ley, 30 L.P.R.A. sec. 110.) Como ordena este artículo, al tribunal se recurre como medio alterno para impartir eficacia al *pacto acordado* entre acreedor y deudor, en caso de no obtenerse el consentimiento de los titulares de obligaciones reales inscritas. Nótese que el expediente judicial de que trata este Art. 61 se *tramita* antes de suplirse la refacción por el acreedor. Tiene naturaleza de "autorización judicial" para que el deudor pueda *garantizar* la refacción. No está disponible para garantizar *a posteriori* el valor de materiales inicialmente entregados sin exigencia por el acreedor de este tipo de garantía.

El Art. 106 del Reglamento dice que el deudor será el peticionario en el citado expediente judicial, por ser la parte principalmente interesada en obtener la refacción, la que su acreedor no le anticipará hasta tener la certeza de que estará garantizada por anotación que surtirá "todos los efectos de la hipoteca". (Art. 59 Ley—30 L.P.R.A. sec. 108.)

Considerando que las recurridas Rexach y Lausell nunca concertaron un contrato de refacción con la dueña de la obra Jardines de Monte Olivo, aviniéndose a entregar, como entregaron los materiales de construcción sin exigir esa garantía;

y que el expediente provisto en el Art. 61 de la Ley no es vehículo para garantizar retroactivamente(¹) prestaciones cumplidas con anterioridad a la radicación de la solicitud de autorización judicial por el deudor, la sentencia recurrida debe ser, revocada.

---

(¹)Dispone el Art. 106 del Reglamento que para instruir el expediente "hará el deudor una solicitud al juez de primera instancia del partido en que esté situada la finca, expresando *las obras que ésta necesite, el costo aproximado de ellas . . . .*" términos claramente prospectivos. (Énfasis nuestro.)